# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 23, 2018         Decided June 19, 2018

No. 17-1158

CELLCO PARTNERSHIP, D/B/A VERIZON WIRELESS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

COMMUNICATIONS WORKERS OF AMERICA,
INTERVENOR

———

Consolidated with 17-1165

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Arthur G. Telegen argued the cause for petitioner. With him on the briefs were Robert A. Fisher and N. Skelly Harper.*

*Barbara A. Sheehy, Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were Peter B. Robb, General Counsel, Linda Dreeben, Deputy Associate General Counsel, Usha Dheenan, Supervisory Attorney, and Jared D. Cantor, Attorney.*

Before: GARLAND, *Chief Judge*, PILLARD, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge:* It is rare that we reject a Labor Board finding based simply on a lack of substantial evidence. This is such a case. Here the Board accepted an ALJ's finding that Petitioner Verizon's discharge of an employee for lying during an investigation was a pretext to rid the company of a prominent union supporter. We conclude that there is insufficient probative evidence to support the finding. We also reject the ALJ and Board's alternative finding that even if she did lie, it was within the context of an inquiry into protected activity, and therefore immune.

**I.**

Bianca Cunningham was a long-time employee of Verizon who was active in a successful union campaign for the Communication Workers of America at six Verizon Wireless stores in Brooklyn. She worked at the Bensonhurst store, and served on the union's bargaining committee. Victory Eshareturi, on the other hand, worked at the Bay Ridge store under supervisor Graves. On the day in question, May 21, 2015, Eshareturi and Graves had a falling out, leading a fearful Eshareturi to seek advice from Cunningham during her lunch break. (Cunningham had previously advised Eshareturi.) She first called Cunningham, then texted her asking whether she should ask District Manager Broomes, Graves' supervisor, for permission to leave. Cunningham agreed, but said, "I'm speaking to HR right now so that will speed it up." Eshareturi called Broomes, who diverted the conversation into whether

Eshareturi would prefer working in a different store. She ended the call by saying she had "to clock back in to work." Meanwhile, Cunningham texted, "Don't worry about Ryan [Broomes]." But Eshareturi responded that Broomes had not given her permission to leave. Cunningham replied, "You can leave, just make sure you e-mail me." Eshareturi then clocked out without permission from anyone in management.

Graves then alerted Broomes that Eshareturi had left without informing anyone else. Broomes tried to reach Eshareturi, leaving a voicemail directing her to call him back, but she didn't – although she did text Cunningham about Broomes' call and sent Cunningham an e-mail account of the day's events. Finally, the next evening, May 22, Eshareturi answered another Broomes call, explaining that the situation with Graves had made her uncomfortable and that Cunningham had told her that HR had given her permission to leave. Broomes was surprised, but Eshareturi reiterated her understanding.

That day, Verizon's Director of Labor Relations Ulrich and O'Neil, the union's representative, discussed the matter. O'Neil was told that Eshareturi would be placed on paid leave until the issue could be resolved. Verizon started an investigation to determine why Eshareturi had left work without authorization and what should be done about it. The parties agree that such an investigation is normal.

On May 27, Eshareturi told Verizon Human Resources employees that Cunningham said it was okay for her to leave work. While Eshareturi did not know from whom Cunningham had gotten that permission, she recalled that Cunningham "said she was going to reach out to people to get advice on whether I could go or not," and that Cunningham had mentioned HR. Eshareturi also said numerous times that she had texted with

Cunningham that day, but that she couldn't remember if the two had talked over the phone.

Verizon then sought to verify this account with Cunningham. Cunningham, however, said that they had only spoken by phone and had not exchanged any substantive text messages. Further, she flatly denied telling Eshareturi she could leave work:

*Verizon:* Did you ever tell her . . . to go home?
*Cunningham:* No.
*Verizon:* Or that somebody else told you to tell her to go home?
*Cunningham:* No.
. . .
*Verizon:* To our understanding . . . from the conversation that was told to Ryan [Broomes], he mentioned that he was told from Victory [Eshareturi] that you said that you got approval from HR, so I was just wondering did you know where that would come from?
*Cunningham:* That was probably a misunderstanding.
. . .
*Verizon:* Ok, so never at one time during that conversation did you mention that she should go home or?
*Cunningham:* She asked me my personal opinion . . . . That was my personal opinion, that wasn't like a direction. I was just saying definitely if I felt threatened or unsafe in my environment, I would go home.
*Verizon:* But your direction was to reach out to Ryan?
*Cunningham:* Correct.

This interview troubled Verizon officials, as it directly contradicted Eshareturi's account of the events that day. Five days after this first interview, they called Eshareturi back and questioned her at length about her story. Verizon repeatedly

asked Eshareturi to voluntarily share the text messages, which were on her personal phone, in order to validate her story. Eshareturi declined.   However, when Cunningham was interviewed after Eshareturi, she again denied that any substantive conversation had occurred over text, stating that "[i]t wasn't conversations, it was quick stuff like – I'll call you back or give me a few minutes."  Cunningham also declined to share the text messages with Verizon.

Verizon believed Cunningham.  During the ten days after this second interview, the company came to the conclusion that Eshareturi had been dishonest during the investigation about whether she had received permission to leave and the nature of her communications.  Since she had been clearly reminded at the outset of each interview of the provision in its Code of Conduct requiring honesty during investigations, Verizon decided, in mid-June, to terminate Eshareturi.  The company waited until the next bargaining session, in July, to inform the union of this decision, so that it could complete an unrelated investigation and deal with both matters in a single meeting.  And then, to comply with an agreement that Verizon had reached with the union establishing a protocol for all potential terminations (a process they called an "*Alan Ritchey*" meeting), the two parties arranged to meet two weeks later, on August 6.

Through her union involvement, Cunningham found out that Eshareturi was facing termination for dishonesty about their interaction.  She then decided to reveal the text messages to the company at the *Alan Ritchey* meeting, and did so after Verizon stated that it would be firing Eshareturi for her dishonesty. When they saw the messages, the Verizon employees were taken aback. Ulrich, for example, testified that the revelation took him completely by surprise:

> I was shocked. It had been several weeks that we had seen one story from Victory [Eshareturi] and a story from Bianca [Cunningham] and I had credited the story that Bianca was telling. In fact, the company credited that story and it wasn't until this conversation and this sharing of the text messages that that story had changed. And I had no anticipation that there would be text messages shared, that the perception that the company held going into that bargaining session would change in such a way.

After seeing the texts, it became clear that the primary aspects of Eshareturi's account that had caused concern for Verizon – the statements that Cunningham had mentioned HR, that she had given Eshareturi permission to leave, and that the exchange had taken place via text message – were all true. Further, they contradicted Cunningham's previously believed account. And Cunningham had not only received the same Code of Conduct integrity reminders at the beginning of her interviews that Eshareturi had received, but also had jeopardized Eshareturi's employment. Verizon thus turned its inquiry toward Cunningham's truthfulness.

Over the next two and a half weeks, Verizon conducted several interviews with Cunningham and Eshareturi, along with its own internal deliberations, in an attempt to understand why Cunningham had not provided an accurate account. In a meeting on August 11, Cunningham asserted again that most of the substantive interaction with Eshareturi had occurred over the phone – but she refused to provide phone records to back up this assertion.[1] Ultimately, Verizon Human Resources decided on

---

[1] Though only one call lasting two minutes had occurred between the two employees before all of the texting, Verizon did not yet have proof of this fact.

August 23 that Cunningham had violated the Code of Conduct because she "lied multiple times" during the interviews leading to Eshareturi's *Alan Ritchey* meeting and "made a knowingly false statement" during the August 11 interview. Broomes, working with Human Resources, recommended that Cunningham be terminated for this Code of Conduct violation, and his immediate superior, director of retail sales Wendy Taccetta, testified that this termination was approved "[f]or lying during the investigation." Cunningham was informed the next day – eighteen calendar days after she had revealed the text messages that narrowly averted Eshareturi's firing – and was subsequently terminated following a procedural *Alan Ritchey* meeting. Eshareturi, on the other hand, received a Final Written Warning from Broomes admonishing her for "leaving in the middle of your shift without permission or notification to management (including failing to call me back before leaving your shift)" and for "subsequently ignoring my multiple calls on 5/21 and ignoring my request to call me back."

On August 12, the day after Cunningham's interview, she texted to Graves, "Hi, Graves, its Bianca – these people are on a witch hunt." He responded, "I'm sure they are – they definitely have a hit list and will use anyone who's down for it."

On August 25, the Union filed a charge with the Board, and the General Counsel issued a complaint. Significant evidentiary disputes occurred during the hearing. Ultimately, the ALJ held that Verizon had violated Section 8(a)(3) of the Act in firing Cunningham. The Board affirmed the ALJ, though it disclaimed

reliance on several of his findings in a footnote.[2] This petition followed.

## II.

Petitioner's challenge to the ALJ's opinion, as adopted by the Board, focuses on its claim that the opinion's finding that Cunningham's discharge was motivated by anti-union animus was not supported by substantial evidence. To be sure, Petitioner alternatively argues following the *Wright Line*[3] structure that, even if the General Counsel had produced evidence that it had acted with a discriminatory motive, it could prevail anyway because it has shown that it would have fired Cunningham in any event. But it is unnecessary for us to consider the alternative argument because we conclude that there is simply a lack of substantial evidence that the discharge was motivated by anti-union animus.

---

[2] The evidentiary disputes centered on two exhibits, GC-33 and GC-49, which Verizon asserts were protected by attorney-client privilege but were inadvertently produced during discovery. GC-33 is a draft of the administrative form that was ultimately used to terminate Cunningham. GC-49 is a chain of emails between Ulrich and Verizon's lawyers, in which the latter provide legal advice about the termination process. The ALJ admitted these to the record and relied upon them in his analysis, and Verizon hotly challenged that decision before us. The ALJ noted that his conclusion would obtain even without GC-49, and the Board chose not to rely on this contested evidence. The Board also disclaimed reliance on one piece of evidence – a handbook that was found in a separate case to contain unrelated violations – that the ALJ used to justify a finding of animus in the first step of its *Wright Line* analysis.

[3] *Wright Line*, 251 NLRB 1083 (1980) established a two-step framework that is by now familiar to us. *See, e.g.*, *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 218 (D.C. Cir. 2016).

The ALJ relied on several pieces of evidence to support a finding of animus, only three of which were relied upon by the Board.[4] First, he cited the month-long series of texts between Graves and Cunningham – particularly Graves' mention that Cunningham was on a "hit list." This reference to a figurative "hit list" is not probative of anti-union animus, however, as Graves expressly testified that the list "wasn't union or non-union." The ALJ failed to identify any record evidence – and we are not aware of any – that rebuts this significant caveat.[5] In any event, we have held that a stray comment by a junior supervisor who plays no part in a decision to discharge an employee, without more, is of little significance in measuring evidence of anti-union animus.[6] *MECO Corp. v. NLRB*, 986 F.2d 1434, 1437 (D.C. Cir. 1993). It is undisputed that Graves was not involved in any way in the decision to discharge Cunningham.

---

[4] The Board accepted the ALJ's recommended finding without passing on the question whether the two exhibits that Petitioner claimed were covered by attorney-client privilege were properly introduced. (More about that later.)

[5] Indeed, when asked to support the only assertion within the text conversations that did refer to the union – that Verizon management packed Cunningham's store with outspoken union supporters – Graves explained that his only source for that view was "Mark," a union shop steward. This sort of hearsay from a union official cannot be the basis for an animus finding.

[6] Of course, if Graves had testified, based on his insight as a manager, that Verizon had actually maintained a hit list of union supporters (whether literal or figurative), that would be another matter. But that would go well beyond the type of isolated remarks we see here or in other precedents. *See MECO*, 986 F.2d at 1435, 1437; *Hudson, Inc.*, 275 NLRB 874, 874-75, 878 (1985).

The next piece of evidence on which the ALJ relied is quite puzzling. He ascribed a bad motive to the company because of the "length and breadth of the investigation into the events of May 21." It is true that the company proceeded carefully. After all, it knew that Cunningham was active in the union, so her discharge would be controversial. But the first delay was for the *Alan Ritchey* meeting in accordance with the company's agreement with the union to discuss potential discipline – and at that point, it was Eshareturi, not Cunningham, who was the subject. It was not until Cunningham revealed the texts at the August 6 meeting that the company's focus turned to her truthfulness during the investigation. In short, it was Cunningham herself who was responsible for the extensive delay.[7]

There remains only the ALJ's evaluation of the company's treatment of other employees in similar situations. The ALJ determined that Verizon's treatment of Cunningham was out of line with its treatment of other employees the General Counsel asserted were dishonest in circumstances materially equivalent to Cunningham's but were not fired, suggesting that Cunningham was a special target. Under the *Wright Line* framework, that sort of evidence can discharge the General Counsel's burden of showing anti-union animus. *See Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1075 (D.C. Cir. 2016). The company, for its part, produced evidence that eight employees had been fired for dishonesty during investigations,

---

[7] The ALJ also pointed for support to evidence – in another case – involving the company's Code of Conduct. *See Cellco Partnership d/b/a Verizon Wireless*, 365 NLRB No. 38 (2017). The Board, realizing that was unrelated, excised that finding.

along with unrebutted testimony that they would not have been discharged if they had not lied.[8]

Here, however, the General Counsel's evidence is woefully inadequate. In one case, the ALJ concluded that a manager who was disciplined had lied during an investigation notwithstanding the company's conclusion – at the time – that she misremembered rather than lied. But the issue is not how the ALJ would have evaluated an individual's truthfulness in a case he didn't hear. The only question is whether the company excused someone it reasonably believed was lying.

Similarly, the ALJ determined that an employee who had claimed to lose company property had actually lied. But the record reveals that the company believed him when he explained he had inadvertently left it in a traded-in car; the employee was cited only for his misuse of company property, not for dishonesty. And finally, the ALJ pointed to evidence that a group of employees who engaged in misconduct and lied during a subsequent investigation were not fired, but the investigation revealed they were directed to engage in the misconduct by managers – and the managers were fired.

The ALJ did not find that Petitioner inconsistently treated instances of employee dishonesty during investigations. He simply put himself in the hypothetical position of management to determine whether he thought he would have concluded differently about whether the underlying dishonesty existed. To be sure, if in the prior cases the company was obviously calling a spade an ax to avoid applying a uniform policy, that would be one thing. But we do not see anything like that; the only

---

[8] The ALJ dismissed that counterfactual hypothesis as "speculative" and "self-serving."

legitimate question for the ALJ was whether the company applied the policy reasonably consistently.

To make matters even worse, the ALJ examined other disciplinary cases – not involving dishonesty during an investigation – and opined the targets should have been discharged because the employees' conduct was (in his view) even worse than lying during an investigation. Here the ALJ is unabashedly taking on the company's business judgment chair – and that has been repeatedly held to be improper. *See MECO Corp.*, 986 F.2d at 1438; *Sutter East Bay Hospitals v. NLRB*, 687 F.3d 424, 435-36 (D.C. Cir. 2016).

It is clear that Verizon has made a legitimate business judgment – a not unusual one – that an employee lying during an investigation is a serious threat to management of the enterprise. The Board has no warrant to challenge that decision. Indeed, another example of the company's policy can be found in the facts of this very case. After all, Petitioner had determined to discharge Eshareturi, an employee with no known particular union sympathies, before Cunningham revealed the evidence that vindicated Eshareturi and turned the investigation toward herself.

The Board's brief argues that its reading of the ALJ's opinion suggests that he didn't believe Cunningham actually lied, but only "misremembered." Examining the relevant dialogue, we think that conclusion is farfetched. But in any event, the relevant question again is not the validity of the ALJ's business judgment but only whether the company's judgment was reasonably consistent. Here, however, just as in *Sutter East Bay*, "[r]ather than applying the *Wright Line* test by examining [Verizon]'s reasonable beliefs and how those beliefs might have

informed [its] disciplinary decisions, the ALJ simply reached factual conclusions about what happened." 687 F.3d at 436.[9]

Although the Board did not rely at all on the ALJ's reading of company documents that were inadvertently turned over and which the Petitioner claimed were covered by attorney-client privilege, if we thought they constituted "smoking guns," we might be inclined to remand for the Board to resolve the thorny question whether the company waived the privilege by turning them over to the General Counsel. But we don't regard those documents of significance. The ALJ, drawing upon them, made much of the timing of the announced decision and who in management was or was not involved. But to us that simply reflects the care and deliberateness that would normally accompany a controversial decision. It is really not relevant to the core issue. The ALJ also focused on the advice given by one lawyer that the company should be aware that even after discharge, Cunningham could remain on the bargaining committee as evidence of anti-union animus. But we think that is unwarranted. After all, it is undisputed that the company knew Cunningham was active in the union. It is not unlawful for Verizon to consider the collateral consequences of its personnel decisions, and there is no evidence in this exchange that Cunningham's union activity played a role in her termination. It therefore does not, by itself, reflect animus against Cunningham.

\* \* \*

---

[9] Chairman Miscimarra openly stated that his decision not to reach the ALJ's argument in the alternative (which we address below) rested on his own assessment that Cunningham had not lied. This repeats the same error.

The ALJ alternatively concluded that even if Cunningham lied during the investigation, her discharge violated 8(a)(3) because the company's questions were probing into Section 7 protected activity – her discussions with Eshareturi. Therefore, notwithstanding the company's policy, she had no obligation to be honest. The implication of that proposition would undermine any company's – not necessarily only a unionized one[10] – ability to institute a policy like Petitioner's. If an employee were suspected of misbehavior and was questioned, he or she could respond, "I spoke to another employee, perhaps a union official, and therefore I have no obligation to answer any questions."

Of course, employees are not obliged to answer truthfully if an employer is really seeking to probe into protected actions as, for instance, in our recent case, *United Services Automobile Ass'n v. NLRB*, 387 F.3d 908 (D.C. Cir. 2004). In that case, an employee distributed literature criticizing the company during non-working time – an activity protected under *Republic Aviation Corp. v.* NLRB, 324 U.S. 793 (1945). The company questioned the employee as to who was distributing the literature and under what circumstances. She resisted answering truthfully and was subsequently fired. There, the employer's questioning was intended to enforce an illegal no-distribution policy. Here, by contrast, it cannot be thought that the company was illegally concerned as to why an employee left work without authority.

The key, then, is the employer's motive. *See United Services*, 387 F.3d at 917. Here there can be no question that the company was entitled to inquire into the reason an employee walked off the job without management permission and

---

[10] Concerted activity, of course, can occur even outside the context of a unionized business. *See, e.g.*, *Inova Health System v. NLRB*, 795 F.3d 68, 74 (D.C. Cir. 2015).

disobeyed instructions to contact her manager. There is no indication here that Petitioner was doing any more than conducting a valid inquiry with no motive to pry into or interfere with protected activities. To the contrary, Eshareturi was relying on her conversation with Cunningham as a defense, rather than trying to protect it from disclosure to management. Indeed, if Cunningham had admitted that she told Eshareturi to leave, there is no indication that Cunningham would have been punished, let alone discharged.

We therefore reject the ALJ's alternative holding that Verizon's questions unlawfully pried into protected activity. Because, again, we do not find evidence to support a finding of anti-union animus, we grant Verizon's Petition for Review and deny enforcement of the Board's order.

*So ordered.*