# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 7, 2025

Lyle W. Cayce
Clerk

No. 24-60242

Apple Inc.,

*Petitioner/Cross-Respondent*,

*versus*

National Labor Relations Board,

*Respondent/Cross-Petitioner*.

Appeal from the National Labor Relations Board
Agency No. 02-CA-295979

Before Richman, Willett, and Douglas, *Circuit Judges.*
Don R. Willett, *Circuit Judge*:

This labor-relations case arises from a unionization effort at an Apple retail store. The National Labor Relations Board, adopting the findings of an administrative law judge, concluded that Apple violated the National Labor Relations Act in two ways: first, by coercively interrogating an employee, and second, by removing union literature from a breakroom. We grant Apple's petition for review and REVERSE because substantial evidence does not support either finding.

No. 24-60242

I

A

Jordan Vasquez worked at Apple's retail store near the World Trade Center in New York City from September 2019 through September 2022. He held no supervisory role and reported directly to the store's senior managers during his shifts.

In early 2021, Vasquez—together with his colleague Ian O'Hara and other store employees—formed an organizing committee in coordination with the Communication Workers of America (CWA), intervenors in this case. Between January and May 2022, Vasquez regularly discussed wage increases with his coworkers. In April, he raised the issue with a senior manager, who referred him to Apple's human resources department. Vasquez later met with a representative HR.

On May 9, 2022, senior manager Stephanie Gladden approached Vasquez on the sales floor—a space open to the public—shortly before the start of her shift. It was Gladden's routine practice to speak with employees on the sales floor at the beginning of her shift—a practice she had followed with Vasquez in the past. That day, Gladden asked Vasquez how he was doing and mentioned that she had heard he had met with human resources. Vasquez replied that the meeting had gone well and that they had discussed his interest in securing higher pay for Apple employees. According to Vasquez, Gladden then asked whether he had spoken with other employees about higher pay. He said that he had. Vasquez further testified that Gladden asked how many employees he had spoken with, to which he responded that he was not keeping track.

According to Vasquez, Gladden then asked what he thought about the unionization efforts at Apple. He responded that his name had been linked to union activity, but that he did not want to be associated with something he

was not involved in. Vasquez further testified that Gladden replied by assuring him that Apple would ultimately "do the right thing." He also stated that he did not disclose his role in the organizing committee because, at the time, the group was deliberately keeping its efforts "under wraps."

Gladden's account of their sales-floor interaction diverged from Vasquez's in at least one material respect. She testified that it was Vasquez—not she—who first raised the topic of unions, doing so in response to her routine inquiry about how his day was going. Gladden confirmed that Vasquez appeared upset that his name had been linked to pro-union activity. She testified that she told him employees are permitted to discuss unionization and asked why such conversations would trouble him. Gladden also recalled asking Vasquez about his recovery from a recent knee injury.

After speaking with Gladden, Vasquez told O'Hara that Gladden had asked his opinion on unionization. Vasquez later told another senior manager that someone had inquired about his views on unionization, though he declined to identify who.

B

Six days later, on May 15, 2022, the organizing committee made its union campaign public. Vasquez and O'Hara began wearing red bracelets bearing the union's initials and distributed them to coworkers—without interference from Apple. They also handed out union flyers outside the store and placed additional flyers on a table in the employee breakroom.

Fifteen minutes after the first flyers were placed, an Apple manager photographed them before leaving the breakroom. About an hour later, the store manager entered the breakroom and removed the flyers.

During their lunchbreak, Vasquez and O'Hara replaced the flyers, only for a different manager to remove them minutes later. Roughly an hour

after that, O'Hara placed more flyers on the table but removed them voluntarily a few minutes later after conferring with Vasquez.

Apple did not prohibit employees from handing out union flyers, but it maintained that two policies barred leaving materials unattended on the breakroom table. First, Apple pointed to a general housekeeping and cleanliness practice aimed at keeping the store—located in a high-profile area of New York City—"grand opening ready every day, every minute," including in nonpublic areas. This policy, however, is unwritten. As part of the practice, store leaders routinely remove visible trash to "convey ownership over, and pride in, the workplace." Second, Apple invoked its official Solicitation and Distribution Policy, **AR.499–500**, which states in relevant part:

> As an Apple employee, you're not permitted to solicit other employees—including for your own hobbies or business (such as jewelry, makeup, personal training services), charitable campaigns or political causes—during work time. Additionally, you may not distribute material during work time or in a work area. Third parties are not permitted to distribute materials or solicit employees, vendors, or customers on Apple property at any time.

> Employees may not use Apple's bulletin boards to distribute materials or solicit employees, vendors, or customers. In addition, third parties may not use any Apple system (electronic or physical) to distribute materials or solicit employees, vendors, or customers.

According to the Board and several Apple employees, "there are often newspapers on the breakroom table," and "[c]oupons for Shake Shack and Burger King have sat on the table throughout a shift."

After the flyers were removed on May 15, store leader Waleed Abdelal spoke with Vasquez about Apple's cleanliness standards and its non-

solicitation policy. He later texted Vasquez a copy of the policy. Although Vasquez disagreed that the flyers violated either policy, he nonetheless stopped leaving them in the breakroom.

O'Hara resumed placing flyers in the breakroom on May 27 and again on June 1. On both occasions, senior managers removed the flyers within minutes. In some instances, managers shredded the flyers after removing them.

The senior managers maintained that the flyers were removed without regard to their pro-union content. They testified that the removals were not intended to oppose unionization, but were consistent with their general practice of clearing materials from shared spaces to maintain cleanliness and adhere to Apple's policies.

## C

Section 7 of the National Labor Relations Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."[1] Section 8(a)(1), in turn, makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their Section 7] rights."[2]

On May 18, 2022, the Union filed an unfair labor practice charge. Later that year, the Board issued an administrative complaint based on that charge. The complaint alleged that Apple violated Section 8(a)(1) of the Act by unlawfully interrogating employees about their union support and other

---

[1] 29 U.S.C. § 157.

[2] *Id.* § 158(a)(1).

protected concerted activities. It further alleged that Apple violated Section 8(a)(1) by selectively and disparately enforcing its Solicitation and Distribution Policy and by prohibiting employees from leaving union flyers on the breakroom table.

After a two-day hearing, the Administrative Law Judge (ALJ) sustained both charges and found that Apple violated the NLRA. Significantly, the ALJ "credit[ed] Vasquez'[s] account of the May 9, 2022, conversation as opposed to Gladden's," noting that "Vasquez'[s] account of their conversation did not include [some] statements." The ALJ credited only one aspect of Gladden's testimony: that she approached Vasquez "in connection with her general practice of briefly speaking with each employee on the sales floor at the beginning of her shift."

Apple filed exceptions to the ALJ's decision. The Board, however, affirmed on May 6, 2024, and ordered Apple to cease and desist from the violations and to post a remedial notice.

Apple petitioned this court for review, contending that Gladden did not coercively interrogate Vasquez; that, in any event, her statements are protected by the First Amendment; and that Apple enforced its breakroom policies consistently and without regard to content. The Board cross-applied for enforcement of its Decision and Order, and the CWA timely intervened.

## II

*Jurisdiction*. The Board had jurisdiction over the proceedings below under Section 10(a) of the NLRA.[3] We have jurisdiction over Apple's petition for review and the Board's cross-application for enforcement under

---

[3] *Id.* § 160(a).

No. 24-60242

29 U.S.C. § 160(e)–(f). Both applications are timely, as the Act imposes no statutory deadline.[4]

*Venue*. Venue is proper in this circuit because Apple "transacts business" here[5]—it maintains a "physical presence" and employs personnel within our jurisdiction.[6]

## III

Under the NLRA and the Administrative Procedure Act, the Board's *factual* findings are "conclusive" if they are "supported by substantial evidence on the record considered as a whole."[7] We "uphold the Board's factual findings" under this standard "only if they are supported by evidence that is substantial when viewed in light of the record as a whole, including 'whatever in the record fairly detracts from its weight.'"[8] We are "not left merely to accept the Board's conclusions,"[9] nor are we "a mere rubber stamp."[10] The substantial-evidence standard governs the Board's findings on

---

[4] *See generally id.* § 160.

[5] *See id.* § 160(f).

[6] *Bally's Park Place, Inc. v. NLRB*, 546 F.3d 318, 321 (5th Cir. 2008) (first citing *Davlan Eng'g, Inc. v. NLRB*, 718 F.2d 102, 103 (4th Cir. 1983); and then citing *Olin Indus., Winchester Repeating Arms Co. Div. v. NLRB*, 191 F.2d 613, 614 (5th Cir. 1951)).

[7] 29 U.S.C. § 160(e); *see also* 5 U.S.C. § 706(2)(E); *Tesla, Inc. v. NLRB*, 120 F.4th 433, 439 (5th Cir. 2024) (en banc).

[8] *Thryv, Inc. v. NLRB*, 102 F.4th 727, 737 (5th Cir. 2024) (quoting *Dish Network Corp. v. NLRB*, 953 F.3d 370, 376 (5th Cir. 2020)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

[9] *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003).

[10] *NLRB v. Arkema, Inc.*, 710 F.3d 308, 314 (5th Cir. 2013) (citation omitted).

No. 24-60242

both coercive interrogation and the unlawful confiscation of union materials.[11]

We "will affirm the Board's legal conclusions 'if they have a reasonable basis in the law and are not inconsistent with the [NLRA].'"[12] But as the Supreme Court has emphasized, courts must apply "traditional tools of statutory interpretation when so assessing; we do not simply defer to an agency's interpretation of 'ambiguous' provisions of their enabling acts."[13]

## IV

Apple seeks review of two Board determinations: first, that senior manager Stephanie Gladden unlawfully interrogated an employee in violation of the NLRA; and second, that Apple managers unlawfully removed union materials from a breakroom table and discriminatorily enforced workplace policies against pro-union literature.

## A

We begin with the Board's finding that Apple engaged in coercive interrogation. The Board concluded that Apple violated Section 8(a)(1) of the Act because Gladden "coercively interrogated" Vasquez about his union-related activity. Apple denies that any coercion occurred. We agree with Apple: the Board's finding is not supported by substantial evidence.

---

[11] *See NLRB v. McCullough Env't Servs., Inc.*, 5 F.3d 923, 927–28 (5th Cir. 1993); *Poly-Am., Inc. v. NLRB*, 260 F.3d 465, 481 (5th Cir. 2001).

[12] *Hudson Inst. of Process Rsch. Inc. v. NLRB*, 117 F.4th 692, 700 (5th Cir. 2024) (alteration in original) (citations omitted).

[13] *Id.*

No. 24-60242

"To determine whether an interaction between an employer and employee constitutes a coercive interrogation, we examine 'the totality of the circumstances in which the interrogation occurred.'"[14] The relevant inquiry is "whether the questioning tends to be coercive, not whether the employees are in fact coerced."[15] We consider eight factors:

> (1) the background, or history of employer hostility and discrimination; (2) the nature of the information the questioner seeks; (3) the rank of the questioner in the company hierarchy; (4) the place and manner of the interrogation; (5) the truthfulness of the employee's reply; (6) whether the employer had a valid purpose in obtaining the information sought about the union; (7) whether a valid purpose, if existent, was communicated to the employee; and (8) whether the employer assured the employee that no reprisals would be forthcoming should he or she support the union.[16]

These factors are "not a mandate for formalistic analysis," but rather serve as "analytical guiding lights" in assessing coercion.[17] Critically, "[n]o single factor is determinative[,]" and coercion may be found even where most factors favor the employer.[18]

Both Apple and the Board agree on the first and third factors. Apple has no history of hostility or discrimination toward union activity.[19] And the

---

[14] *Renew Home Health v. NLRB*, 95 F.4th 231, 243 (5th Cir. 2024) (quoting *NLRB v. Laredo Coca Cola Bottling Co.*, 613 F.2d 1338, 1342 (5th Cir. 1980)).

[15] *NLRB v. Varo, Inc.*, 425 F.2d 293, 298 (5th Cir. 1970).

[16] *Renew Home Health*, 95 F.4th at 243 (citation omitted).

[17] *UNF W., Inc. v. NLRB*, 844 F.3d 451, 461 (5th Cir. 2016).

[18] *Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 561 (5th Cir. 2003).

[19] The absence of prior union activity is immaterial. Both the ALJ and the Board—by adopting her recommended order—accorded that fact undue weight.

alleged "interrogation" occurred in a public setting—on the store's sales floor—during a routine managerial check-in. Both factors favor Apple.

Turning to the fifth factor—"the truthfulness of the employee's reply"[20]—both sides agree that Vasquez's denial of union involvement was untrue. What remains in dispute is his *motive* for the false statement. According to the Board, Vasquez's "evasive" response "objectively indicates possible fear of retaliation against the questioned employee or others if honest and direct answers were given."[21] Apple takes a different view, asserting that Vasquez was not fearful but strategic: he "responded untruthfully for reasons of campaign strategy," as the organizing committee was "trying to keep organizing efforts under wraps for a while longer." On that basis, Apple argues, Vasquez's false statement does not "objectively indicate[] possible fear of retaliation."[22]

We agree with the Board that an untruthful or evasive response may "*objectively*" suggest that the questioning "tends to coerce employees."[23] It is true that none of the cases the Board cites involved alternative, non-retaliatory explanations for the employee's untruthfulness. Here, however, Vasquez *admitted* that he lied about his unionization efforts to preserve the secrecy of the nascent organizing campaign.[24] Still, as the Board emphasizes,

---

[20] *Renew Home Health*, 95 F.4th at 243 (internal quotation marks and citation omitted).

[21] *NLRB v. Brookwood Furniture*, 701 F.2d 452, 462 (5th Cir. 1983) (quotation marks and citations omitted).

[22] *Id.*

[23] *Id.* at 460, 462 (emphasis added).

[24] *See Dow Chem. Co., Tex. Div. v. NLRB*, 660 F.2d 637, 651 (5th Cir. 1981) ("That neither Hernandez nor Gary said they felt coerced, . . . indicate[s] its noncoercive nature."); *id.* at 653 ("Elliott did not testify that he felt coerced and the question is not in

the very fact that the campaign remained "under wraps" may itself "objectively" indicate a coercive environment.[25] Because the inquiry is whether the questioning "tends to coerce"—not whether it actually did—this factor weighs in the Board's favor.[26]

We next consider the substance of Gladden's questions and the purpose behind them. The Board's claim that inquiries about wages or union sentiment are "quintessential example[s] of coercive interrogation" sweeps too broadly. Indeed, "[q]uestioning of employees as to union activities is not illegal *per se*."[27] The cases the Board cites involve additional coercive elements not present here. Many featured aggressive, repeated probing by employers—not a one-off, passing exchange between a single manager and a

---

haec verba coercive. Insubstantial evidence appears in the record to support a finding, even by inference, that Walker's question was anything other than the type of casual or moderate inquiry described as non-violative of [§] 8(a)(1)[.]").

[25] *See Brookwood Furniture*, 701 F.2d at 462 (discussing "evasive answers" during nascent organizing drive).

[26] Our sister circuit recently held that employees' subjective impressions may factor into the totality-of-the-circumstances inquiry "to determine how a reasonable employee would objectively view [the] employer's conduct." *Starbucks Corp. v. NLRB*, No. 24-1585, 2025 WL 1690140, at *3 (8th Cir. Jun. 17, 2025). We need not decide today whether to follow suit: either way, the outcome is the same. Applying the stricter, objective test the Board itself used, the circumstances here do not support a finding of coercively interrogation. *See post*, at 13–14. And if anything, considering Vasquez's subjective response—not out of fear, but as a strategic choice to keep the campaign "under wraps" before going public with flyers and wristbands just a week later—would only reinforce that conclusion.

[27] *Brookwood Furniture*, 701 F.2d at 460; *see also, e.g.*, *Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245, 1255 (5th Cir. 1992) ("An employer with a legitimate cause may interrogate employees on union matters without incurring section 8(a)(1) liability. An interrogation becomes illegal when the 'words themselves or the context in which they are used . . . suggest an element of coercion or interference.'" (citations omitted)); *Ctr. Prop. Mgmt. v. NLRB*, 807 F.2d 1264, 1270 (5th Cir. 1987) ("[Q]uestioning an employee about union sympathies is not per se unlawful[.]"); *Laredo Coca Cola Bottling Co.*, 613 F.2d at 1342 ("[I]nterrogation into union activities is not per se illegal[.]").

single employee.[28] Critically, those cases often involved threats of reprisal or arose against a backdrop of anti-union animus or prior unfair labor practices.[29] Here, by contrast, Gladden expressly reaffirmed Vasquez's right to discuss unionization: "This is something that you can talk about and you can engage in." While Gladden did ask whether Vasquez had spoken to

---

[28] *See, e.g.*, *Renew Home Health*, 95 F.4th at 238, 244 (employer demanded to see private text messages exchanged among employees); *NLRB v. Harbison-Fischer Manufacturing Co.*, 304 F.2d 738, 739 (5th Cir. 1962) (supervisor called employee at home on a Sunday to verify names of union supporters); *Brookwood Furniture*, 701 F.2d at 461 (employer made a "systematic effort to ascertain the employees' sympathies toward the union," including conversations with multiple employees and, in some cases, took place in a "place of authority or 'unnatural formality'" (citation omitted)); *see also TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 416 (5th Cir. 1981) ("[T]he Company engaged in a systematic effort to ascertain the union sympathies of its employees[.]"); *NLRB v. Pope Maint. Corp.*, 573 F.2d 898, 904 (5th Cir. 1978) (finding "widespread interrogation . . . by many, if not most, of the Company's supervisors").

[29] *See, e.g.*, *UNF W., Inc.*, 844 F.3d at 462 (question about union support was "accompanied by a threat referencing [the employee's] economic dependence" on the employer); *Tellepsen Pipeline Servs.*, 320 F.3d at 561 (question about how employee planned to vote in upcoming union election "was coupled with threats of reprisal"); *McCullough Env't Servs.*, 5 F.3d at 929 (questioning about union support occurred after management expressed anti-union views); *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 361, 367 (5th Cir. 1990) (questions about whether employees had discussed wages with one another were coercive because employer had unlawfully prohibited employees from discussing wages); *Ctr. Prop. Mgmt.*, 807 F.2d at 1271 (question about whether employee signed petition was coercive because it occurred "just after [another employee's] discharge in part for union activities" and conveyed that the employer "would tolerate no union organizing"); *Brookwood Furniture*, 701 F.2d at 462–63 (questioning in most instances was "combined with statements which could be viewed as affirmatively warning of economic reprisals"); *Laredo Coca Cola Bottling Co.*, 613 F.2d at 1342 (questions about union support came after employer had "clearly manifested its hostility toward the union"); *NLRB v. Aero Corp.*, 581 F.2d 511, 513–14 (5th Cir. 1978) (questions outside the work building about how many union cards had been signed closely followed employer's illegal surveillance of union meeting); *Sturgis Newport Bus. Forms, Inc., v. NLRB*, 563 F.2d 1252, 1257 (5th Cir. 1977) (questions about the identity of union supporters coincided with threats of plant closure and were made against a background of company opposition to the union); *Tampa Times Co. v. NLRB*, 193 F.2d 582, 583 (5th Cir. 1952) (interrogation was accompanied by threats).

others about wages—and how many—"casual and moderate inquiries, even as to union preference, absent evidence indicating that the employee has reason to consider the inquiries a threat of reprisals, [do] not constitut[e] an unfair labor practice in violation of [§]8(a)(1)."[30]

Next, we consider Gladden's role as Vasquez's direct supervisor. Questions posed by an "immediate supervisor" can support a finding of coercion.[31] At first glance, this factor may seem to favor the Board: Gladden had supervisory authority over Vasquez, even if she did not hold a senior management title. But again, the Board's precedents involved markedly different circumstances—supervisors who "expressed their anti-union views to employees,"[32] "failed to assure [the employees] that no reprisals would be forthcoming,"[33] or "coupled [their questions] with threats of reprisal."[34]

Taken as a whole, the circumstances do not support a finding of coercive interrogation—and the Board identifies no authority that compels the opposite result. The Board selectively invokes precedent focused on isolated factors, but none sustain a finding of coercion when viewed in full context. Crucially, even crediting Vasquez's account, neither the ALJ nor the Board meaningfully engaged with Gladden's testimony, which provided critical context. Indeed, Vasquez testified only that he did not recall whether

---

[30] *Dow Chem. Co.*, 660 F.2d at 650 (citation omitted).

[31] *See McCullough Env't Servs.*, 5 F.3d at 928–29; *see also Tellepsen Pipeline Servs.*, 320 F.3d at 561 (finding unlawful interrogation "[e]ven though [the questioner] was a low-level supervisor who had always treated his employees well").

[32] *McCullough Env't Servs.*, 5 F.3d at 929.

[33] *Id.*

[34] *Tellepsen*, 320 F.3d at 561.

Gladden said anything further—he did not deny that she reaffirmed employees' rights to engage in union activity.

Moreover, as the Supreme Court has cautioned, "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."[35] Accordingly, to withstand substantial-evidence review, the Board must account for "contradictory evidence or evidence from which conflicting inferences could be drawn."[36] The ALJ did not do so here. Gladden's unrefuted testimony—that she expressly reaffirmed Vasquez's right to discuss unionization—"fairly detracts" from any inference of coercion. So too does the absence of evidence that Gladden—or any other supervisor—harbored anti-union animus or issued threats of reprisal.

Viewed in light of the full record, there is not substantial evidence to support the Board's finding that Apple violated the Act.[37]

B

We next consider the Board's second finding: that Apple managers acted unlawfully and discriminatorily by removing union flyers from the breakroom table. Apple maintains that the removals did not violate the NLRA. We agree. Once again, the Board's conclusion lacks the support of substantial evidence.

---

[35] *Universal Camera Corp.*, 340 U.S. at 488; *see also Tesla, Inc.*, 120 F.4th at 440 (quoting same).

[36] *Id.* (quotation marks and citation omitted).

[37] Alternatively, Apple argues that enforcing the Board's order would infringe its First Amendment rights and urges us to require a finding of subjective coercive intent—consistent with other free-speech contexts—before upholding any coercive-interrogation finding. Because we conclude that Gladden did not coercively interrogate Vasquez, we need not reach the First Amendment question.

As a general matter, employees are entitled to distribute union materials during non-work time and in non-work areas.[38] An "obvious corollary" of that right is that "an employer violates section 8(a)(1) by confiscating and destroying union material."[39] Any restriction on this right must be justified by "special circumstances"—that is, by a showing that the limitation is "necessary to maintain production or discipline."[40] For example, a consistently enforced housekeeping policy may qualify—so long as it is genuine and not a pretext for discrimination.[41]

Apple contends that it maintained such a policy, even if unwritten. We agree that a consistently applied policy need not be in writing.[42] Moreover, Apple's Solicitation and Distribution Policy—which *is* in writing—appears

---

[38] *See Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 492–93 (1978).

[39] *Poly-Am., Inc.*, 260 F.3d at 480; *see also NLRB v. Transcon Lines*, 599 F.2d 719, 721 (5th Cir. 1979) (finding violation where employer "removed [an employee's] leaflets from the drivers' room").

[40] *Beth Israel Hosp.*, 437 U.S. at 492–93.

[41] *See, e.g.*, *Page Avjet, Inc.*, 278 NLRB 444, 450 (1986); *N. Am. Refractories Co.*, 331 NLRB 1640, at *6 (2000); *Ozburn-Hessey Logistics, LLC*, 366 NLRB No. 177, at *14 (Aug. 27, 2018) (describing *North American Refractories* as "holding that an employer may lawfully maintain and enforce housekeeping rules that result in the confiscation from nonworking areas of prounion literature left behind following break periods" and finding that the respondent "specifically targeted union literature for removal"), *enforced in relevant part*, 803 F. App'x 876 (6th Cir. 2020); *Mitchellace, Inc.*, 321 NLRB 191, 197–98 (1996) (holding that "[t]he mere fact of a supervisor removing union literature from a break area does not constitute a violation of the Act"—at least "where the supervisor routinely helps keep the break area clean" and where the company also permitted personal messages on the bulletin board).

[42] *See Page Avjet*, 278 NLRB at 445, 450 (finding there was "no existing written policy on solicitation or distribution" but the employer still did not violate Section 7 by "cleaning up the break area at the conclusion of an employee break" because "[e]mployees do not have the right to clutter break areas with union literature").

in the record. The question, then, is not whether these policies exist—but how they are enforced.[43]

In reviewing the record, we may not "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*."[44]

1

The Board advances its own reading of the evidence.

First, it contends that Apple lacked a bona fide housekeeping policy and instead "targeted union flyers." One employee, reflecting on her "six years and five months" at Apple, recalled "two specific instances" in which Shake Shack or Burger King coupons were left in the breakroom for several days before being removed. She also recalled seeing newspapers left out "more than ten times" during her tenure—typically for a "couple of days" before they were cleared. Vasquez, for his part, recalled seeing Shake Shack coupons "once," around the time the restaurant opened, and occasionally seeing newspapers on the breakroom table.

Second, even assuming Apple maintained policies on cleanliness and written materials, the Board contends that managers enforced those policies selectively. On the three days at issue, managers removed only union flyers—and did so within minutes of their placement, often while employees were still in the breakroom. Moreover, they removed the flyers without checking

---

[43] *See Cellco P'ship v. NLRB*, 892 F.3d 1256, 1262 (D.C. Cir. 2018) (noting that the "only legitimate question" is "whether the company applied [its] policy reasonably consistently"); *cf. NLRB v. McGahey*, 233 F.2d 406, 413 (5th Cir. 1956) ("[A]s we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision.").

[44] *Universal Camera Corp.*, 340 U.S. at 488.

whether other items—like food containers or water bottles—had also been left behind and should likewise be cleared. The managers also photographed and shredded the flyers—departures from typical cleanliness and housekeeping practices. Indeed, one Apple manager acknowledged that he had never shredded discarded material before.

In the Board's view, these findings were enough to conclude that Apple unlawfully confiscated union materials.

2

Apple tells a different story: that it applied its policies evenhandedly and removed all manner of written materials—not just union-related ones. The record supports that account. Apple managers cleared a variety of non-union items from the breakroom, including restaurant menus, coupons, and promotional or personal flyers. In some cases, employees who left such items behind were informed that doing so violated the Solicitation and Distribution Policy.

For example, when one employee left flyers inviting colleagues to his debut opera performance in Brooklyn, a manager explained that such materials weren't permitted in the breakroom because they violated the Solicitation and Distribution Policy and contributed to a "cluttered" environment in an already "busy" space. In another instance, an employee posted flyers on a breakroom whiteboard advertising a folk music event in which she was performing. A manager removed the flyers and "ha[d] that conversation with her just around the [non-solicitation] policy and . . . different ways she could potentially talk to the team if she wanted to about it."

Most telling of all, just days before the union flyers were removed, an Apple manager addressed a set of flyers left by a departing employee advertising his going-away party. Those flyers, too, were removed, with

managers explaining that they violated company policy and Apple's "standards in the space." At that point, the manager had not yet seen any union flyers in the breakroom. Five days later—on the same day managers first removed union flyers—Vasquez brought up the party flyers during a conversation with the store leader. The store leader responded that he had "addressed" the earlier flyers with the departing employee, who "was also made aware of" the policy.

Further underscoring Apple's evenhanded enforcement, the company allowed employees to distribute union bracelets and flyers during nonwork time and in nonwork areas. What Apple prohibited was not distribution, but the practice of leaving materials—union-related or not—unattended in the breakroom.

3

Having reviewed the full record, we conclude that Apple's account is more than just a "fairly conflicting" view of the evidence.[45] And considering "the record . . . as a whole"—including evidence that "fairly detracts" from the Board's findings—we hold that substantial evidence does not support the conclusion that Apple unlawfully confiscated union materials.[46]

Our holding rests on three grounds:

---

[45] *Universal Camera Corp.*, 340 U.S. at 488.

[46] *Tesla, Inc.*, 120 F.4th at 440 (first quoting 29 U.S.C. § 160(e)–(f); and then quoting *Universal Camera Corp.*, 340 U.S. at 488); *see also Tri-State Health Serv., Inc. v. NLRB*, 374 F.3d 347, 352 (5th Cir. 2004) ("[T]he Board 'is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands.'" (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998))).

First, our review is not confined to the handful of days when managers removed the union flyers.[47] Apple introduced substantial evidence that managers "attended personally to breakroom tidiness" on multiple occasions. This supports the existence of a general housekeeping policy. In addition, evidence that rank-and-file employees also cleared items from the breakroom table lends further credence to a shared workplace norm of cleanliness.

Looking to the *full* record—not just the three days in question—Apple appears to have enforced its policies "with equal zeal" across all written materials.[48] There is no evidence—let alone *substantial* evidence—that Apple "changed its policy regarding distributions in the break room 'as a reaction to and countermeasure against the union campaign.'"[49] Indeed, Apple applied the same policies to restaurant menus, personal invitations, and promotional flyers for local events—including one instance just days before managers removed the union flyers. That managers photographed the flyers on one occasion suggests an effort to "proceed[] carefully" with conduct that might otherwise appear adverse to union activity.[50] Nor is the shredding of union flyers meaningfully different from discarding other

---

[47] *See N. Am. Refractories Co.*, 331 NLRB 1640, at *6; *see also id.* at *4 (describing a "typical day" and noting that magazines were sometimes left on the table on days unrelated to the removal of union leaflets, as part of broader testimony on general cleanliness practices).

[48] *Id.* at *6.

[49] *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 232 (4th Cir. 2015) (citation omitted).

[50] *See Cellco P'ship*, 892 F.3d at 1261.

written materials—as Apple managers have done before. Whether shredded or trashed, the result is the same: the materials are gone.[51]

The Board's countervailing evidence—two instances involving coupons and a handful of newspapers left out over more than six years—does not rise to the level of substantial evidence. Nor is it "indicative of a discriminatory purpose by" Apple.[52] Indeed, as the Board itself has previously recognized, "[t]hat the evidence . . . shows that there were *occasions* when some lunch trash, a magazine or two, or, even a newspaper were not immediately removed from the lunchroom, following a break, is not indicative of a discriminatory purpose by [an employer] in picking up leaflets . . . due to the disarray."[53] Isolated lapses in clearing written materials from a breakroom—without more—do not support a finding of discriminatory intent in removing union literature. We see no reason to depart from that conclusion today.

---

[51] *Cf. Poly-Am., Inc.*, 260 F.3d at 482 (treating "t[earing] up union flyers and [throwing] them in the trash" as equivalent to "destroy[ing]" and "discard[ing]" union materials); *Fed.-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1253 (5th Cir. 1978) (holding that burning a union card did not violate the Act absent evidence that it "was designed to hurt Emerson or his property, or to influence or to affect the election").

[52] *N. Am. Refractories*, 331 NLRB 1640, at *6; *see also Stern Produce Co. v. NLRB*, 97 F.4th 1, 15 (D.C. Cir. 2024) ("An 'isolated and marginal deviation' from an employer's policy 'fails to show that the policy was not applied in a neutral manner.'" (citation omitted)); *Mitchellace, Inc.*, 321 NLRB 191, 199 (1996) ("As for Scott letting a newspaper remain on one of the tables, that is not inconsistent with Scott discarding as unacceptably messy florescent-yellow sheets of paper that had been on the breaktables throughout the entire shift.").

[53] *N. Am. Refractories Co.*, 331 NLRB 1640, at *6 (emphasis added); *see also Page Avjet*, 278 NLRB at 450 (finding no violation when a "Supervisor [] on one occasion, after an employee break ended in the breakroom, picked up the union literature which was scattered on the floor and left on the tables"); *Stern Produce*, 97 F.4th at 15.

The Board's claim that Apple removed the flyers without considering whether nearby items—such as water bottles or a fruit basket—were abandoned disregards the key distinction between written materials and food. As Apple notes, food items—particularly when employees are present in the breakroom— "likely belonged to particular employees or the company itself" or were actively being consumed mid-break. Such items are "not comparable to flyers left unattended on the table." The flyers—like other unattended written materials before them—were removed pursuant to Apple's generally applicable housekeeping and non-solicitation policies, *regardless of whether or not someone was currently using them.*

Second, the Board's attempt to distinguish cases involving the post-break removal of flyers is unconvincing. As the Board itself acknowledged, "the breakroom was constantly busy with employees on non-work time[,]" and "there was no set conclusion to break periods, such that an empty breakroom would permit managers to determine whether or not materials which remained there were 'abandoned.'" Given those conditions, Apple could not have enforced its policies without running afoul of the very after-break-removal rule the Board appears to endorse. Imposing such a prohibition—especially where employee breaks have no formal endpoint—would defy common sense.[54]

---

[54] Although the concurrence joins our analysis of the non-solicitation policy, it would resolve the flyer-removal issue solely on that ground—declining to consider Apple's housekeeping policy. Expressing doubt about the consistency of Apple's housekeeping enforcement, the concurrence invokes "the general principle that under the NLRA employees have a right to distribute union material on non-work time and in non-work areas," reasoning that "union flyers in a non-work area" could belong to employees who "were presently taking their break." *Post*, at 25. As explained above, however, Apple justifiably relied on—and evenhandedly enforced—both its non-solicitation and housekeeping policies. While we understand the concurrence's concern, the Board's

No. 24-60242

Third, our precedent only forbids "selectively discarding union materials."[55] The Board's reliance on out-of-circuit decisions—which categorically prohibit employers from "confiscat[ing] union literature left for distribution to employees in nonwork areas during nonwork time"[56]—is misplaced. Those decisions do not bind us, and we decline to extend federal labor law to prohibit the evenhanded enforcement of facially neutral housekeeping and non-solicitation policies.[57]

This is not a case in which an employer singled out union material for removal.[58] Rather, it involves an employer that consistently removed *all* unattended written materials from the breakroom—regardless of their content. Because Apple's evenhanded enforcement of its policies amounts to more than a "fairly conflicting view" of the evidence,[59] we are not "left to the sheer acceptance of the Board's conclusions."[60] Substantial evidence does not support the Board's finding, and Apple did not unlawfully confiscate union materials.

---

proposed approach—requiring managers to track the precise endpoint of each employee's break before removing unattended materials—would impose an impracticable burden that is ill-suited to the rhythms of a hectic retail environment where breaks begin and end fluidly.

[55] *Poly-Am., Inc.*, 260 F.3d at 483.

[56] *Intertape Polymer Corp.*, 801 F.3d at 232 (quotation marks and citation omitted).

[57] *See Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 2, 23 (June 22, 2018) (finding a violation where union materials were confiscated directly from employees, but affirming that employers may reserve breakroom counters exclusively for company information), *enforced* 779 F. App'x 752 (D.C. Cir. 2019)).

[58] *See Valley Health Sys., LLC*, 369 NLRB No. 16, slip op. at 2, 16 (Jan. 30, 2020) (finding an NLRA violation where union materials were confiscated "not for any general housekeeping reasons but for the express purpose of precluding employees from receiving the union's messaging").

[59] *See Universal Camera Corp.*, 340 U.S. at 488.

[60] *NLRB v. Mini–Togs, Inc.*, 980 F.2d 1027, 1032 (5th Cir. 1993).

No. 24-60242

V

Apple did not engage in coercive interrogation, nor did it unlawfully confiscate union literature. Because substantial evidence does not support the Board's conclusions, we grant the petition for review and REVERSE.

DANA M. DOUGLAS, *Circuit Judge*, concurring:

I agree that reversal is warranted. I write separately, however, because I would reverse the Board's finding that Apple unlawfully removed and discriminated against union literature based solely on Apple's consistent enforcement of its non-solicitation policy.

Although Apple argued before the Board that both its general housekeeping policy and non-solicitation policy were the impetus for the flyers' removal, the record points overwhelmingly to the non-solicitation policy as the managers' motivation for confiscating the flyers. To be sure, store leader Waleed Abdelal, testified that he discussed cleanliness standards with Vasquez; but Abdelal also testified that he told Vasquez that the non-solicitation policy prohibited the distribution of union flyers. Abdelal further offered to send Vasquez the policy that he believed prohibited Vasquez's conduct. The policy Abdelal sent to Vasquez was the non-solicitation policy, not Apple's general housekeeping policy. Similarly, Yanell Brown, a former manager at the store, testified that he removed the flyers because they "f[ell] into the . . . no solicitation policy." Though Brown discussed the cleanliness standards during his testimony, he specified that "when it comes to flyers and any sort of promotion of things, [managers] would . . . throw those things out," harkening to Apple's prohibition on solicitation. Likewise, O'Hara testified that when he asked manager Jorge Romero to stop removing the union flyers, Romero stated that he could not stop because the flyers were promotional materials.

Thus, we need not reach the Board's alternative finding that the general housekeeping policy was selectively enforced against union flyers

No. 24-60242

because the flyers were not removed pursuant that policy.[1]  Instead, the Board's finding that Apple unlawfully confiscated union literature turns on whether the company selectively enforced its non-solicitation policy.  And I agree with the majority opinion that substantial evidence does not support the Board's finding of selective enforcement as to that policy.  As explained by the majority opinion, the record includes several examples of Apple's prohibiting the distribution of materials, other than union flyers, pursuant to its non-solicitation policy.  *See ante*, at 17, 19.  Accordingly, I concur.

---

[1] Apple's argument that it did not unlawfully enforce its general housekeeping policy against union literature relies heavily on the difference between written materials and food items, such as those that were left on the table when the union flyers were confiscated.  *See ante*, at 21.  But the general housekeeping policy, as described by Apple, does not appear to recognize a distinction between food items and written materials.  *See* Pet'r's Br., at 23 (asserting that the general housekeeping policy required that the World Trade Center Apple Store be "grand opening ready every day, every minute," which means that "store leaders make a point of picking up trash in view of other team members to convey ownership over, and pride in, the workplace").  And though Apple argues that the food items on the table "likely belonged to particular employees," *ante*, at 21, the same could be said of union flyers in a non-work area while employees were presently taking their break, given the general principle that under the NLRA employees have a right to distribute union material on non-work time and in non-work areas.  *See Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 492–93 (1978); *see also Page Avjet, Inc.*, 278 NLRB 444, 450 (1986) (finding that the employer did not violate Section 7 of the NLRA by "cleaning up the break area *at the conclusion of an employee break*" because "union literature in the break area assumes the same character as any other material once the break has ended and employees have returned to work") (emphasis added).